STEVEN G. KALAR
Federal Public Defender
Northern District of California
JOYCE LEAVITT
Assistant Federal Public Defenders
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Telephone:   (510) 637-3500
Facsimile:   (510) 637-3507
Email:       Joyce_Leavitt@fd.org

Counsel for Defendant FARCA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ROSS FARCA,<br><br>Defendant. | **Case No.:** CR 19–0643 JST (SK)<br><br>**DEFENDANT'S MOTION FOR RELEASE FROM CUSTODY BASED UPON CHANGED CIRCUMSTANCES**<br><br>**Court:**          Courtroom 6, 2nd Floor |

### NOTICE AND MOTION

Defendant Ross Farca files this motion for release of custody based upon changed circumstances and due process concerns. His arguments are three-fold. First, the global public health emergency caused by the exponential spread of the Coronavirus Disease 2019 (COVID-19) pandemic is a changed circumstance. COVID-19 has been detected at Santa Rita Jail within the last couple of days and it will only get much worse. For Mr. Farca, who suffers from Autism, obsessive-compulsive disorder (OCD), and Misophonia[1], COVID-19 poses an even greater risk as Mr. Farca's disabilities

---

[1] Misophonia is a selective sensitivity to specific sounds accompanied by emotional distress as well as behavioral responses such as avoidance. It is common to individuals with OCD and parallel

MOTION FOR RELEASE FROM CUSTODY
*FARCA*, CR 19–0643 JST (SK)

1   make it difficult for him to engage in constant hand-washing and other recommended steps to keep

2   COVID-19 at bay without it triggering his OCD and Misophonia. COVID-19 is a changed

3   circumstance which warrants reconsideration of Mr. Farca's request that he be released from custody,

4   especially in light of his disabilities and vulnerability.

5        In addition, the Court should release Mr. Farca because he has been in custody in excess of 4

6   months, and defense counsel's guideline calculations, following a guilty plea, are 0-6 months

7   custody. Although the government calculates a higher loss amount, resulting in a range which is 2

8   levels higher than what defense counsel believes to be the accurate range, either way it is clear that

9   Mr. Farca's advisory guideline range is very low. Meanwhile, on Friday, March 27, 2020, the Court

10  sua sponte continued Mr. Farca's next court appearance from April 3, 2020, to June 5, 2020, "in light

11  of the continuing COVID-19 health crisis." Dkt. 29. This means that were Mr. Farca not released at

12  this time, he will have served more than 7 months in custody at the time of his next appearance for a

13  case in which defense counsel calculates his guideline range to be as low as 0-6 months. Based upon

14  this circumstance as well, the Court should strongly reconsider whether continued pre-trial detention

15  is warranted.

16       Finally, additional changed circumstances exist in that, at the time of the initial hearing, Mr.

17  Farca's father was unwilling to sign a bond. The government argued that Mr. Farca's mother, with

18  whom Mr. Farca has resided all his life[2], was not a suitable surety (either because she enabled his

19  conduct or because she could not control him). However, if the Court were willing to release Mr.

20  Farca to live with his father in Woodland, California, Mr. Tibi Farca would sign an unsecured bond

21  in the amount of $10,000 and act both as a surety and custodian. The court may recall that at the

22  initial detention hearing, the government pointed to incidents in which it was Mr. Farca's father who

23  reported to the police, in 2012, his concern regarding his son's conduct, and also reported to his son's

24  case manager at the East Bay Regional Center (EBRC), in 2015, his concern that his son was not

25  taking his medication. These actions make it clear that Mr. Farca's father recognizes the issues

26

27

28  anxiety disorders. Mr. Farca has extreme sensitivity to dripping water and struggles to wash himself.
    [2] Mr. Farca resided with both parents when he was younger before their contentious divorce years
    earlier.

MOTION FOR RELEASE FROM CUSTODY
*FARCA*, CR 19–0643 JST (SK)

concerning his son, has been proactive in the past when he has seen problems arise, and is willing to report the conduct to the proper authorities. Should the Court release Mr. Farca to live with his father, Mr. Tibi Farca will ensure that his son follows any and all conditions set by the court.

While counsel recognizes that the magistrate judge previously determined that Mr. Farca poses a danger to the community, the changed circumstances outlined above warrant revisiting the issue. Furthermore, counsel believes that at this time conditions could be fashioned which would mitigate the court's concern regarding danger, including Mr. Farca living with his father, prohibiting access to the internet, mental health counseling, cognitive behavioral treatment (including anger management and education regarding tolerance), attending a day program such as EBRC (once orders regarding self-isolation have been lifted), and any other conditions which the Court may deem necessary.

## RELEVANT LEGAL STANDARD

The Bail Reform Act allows a court to temporarily release a detained defendant to the custody of an "appropriate person" where a "compelling reason" necessitates such release. 18 U.S.C. § 3142(i). Specifically, section 3142(i) provides that, where a detention order has been issued, "a judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."

In addition, a detention hearing under 18 U.S.C. § 3142 "may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that "information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f).

Finally, the Court may consider the time spent in pre-trial custody compared to the potential sentence upon a finding of guilt in determining whether due process weighs in favor of release. *See, e.g. United States v. Cos*, 198 Fed. Appx. 727, 732 (10th Cir. 2006)(district court may consider length of pretrial detention in the due process context, at a reopened detention hearing); *United States v.*

1   *Ailemen*, 165 F.R.D. 571, 581 (N.D. Cal.1996)(in considering due process challenges to pretrial

2   detention, courts in some circumstances have compared the length of the likely sentence faced by the

3   defendant to the length of the pretrial detention.).

**ARGUMENT**

**I.     The Court Should Release Mr. Farca Due to Changed Circumstances: COVID-19**

6           As of Friday, March 27, 2020, the COVID-19 pandemic has sickened more than 536,100

7   people worldwide, and killed at least 24,460 people.[3] These numbers climb exponentially on a daily

8   basis. *Id*. In the United States alone, as of March 29, 2020, 125,903 cases of COVID-19 had been

9   confirmed by lab tests and 2,100 deaths have occurred, a figure that has more than doubled since just

10  three days ago. *Id*. The World Health Organization officially classified COVID-19 as a pandemic

11  weeks ago,[4] Governor Newsom declared a State of Emergency and throughout the country,

12  individuals have been ordered to stay at home and "shelter in place."

13          For those who are in prison, the conditions of pretrial confinement create the ideal

14  environment for the transmission of contagious disease.[5] *See, e.g. Our Courts and Jails Are Putting*

15  *Lives at Risk*, Emily Bazelon, New York Times, March 13, 2020, available at

16  https://www.nytimes.com/2020/03/13/opinion/coronavirus-courts-jails.html?searchResultPosition=1.

17  Inmates cycle in and out of detention facilities, incarcerated people generally have poorer health than

18  the general population, and even at the best of times, medical care in custody is (at best) limited.[6]

19  According to public health experts, incarcerated individuals "are at special risk of infection, given

20  their living situations," and "may also be less able to participate in proactive measures to keep

21  themselves safe;" "infection control is challenging in these settings."[7]

22  _____

23  [3] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (March 12, 2020), *at*
    https://nyti.ms/2U4kmud (updating regularly).

24  [4] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020) *at*
    https://bit.ly/2W8dwpS.

25  [5] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases*
    45(8):1047-1055, *at* https://doi.org/10.1086/521910.

26  [6] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail

27  Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice
    Statistics, *at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf

28  [7] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike
    Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the
    United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.

MOTION FOR RELEASE FROM CUSTODY
*FARCA*, CR 19–0643 JST (SK)

1    Because of this ongoing crisis, there is a recognition among the courts that release from custody

2    may be appropriate in these truly "extraordinary times." *See In the Matter of the Extradition of*

3    *Manrique*, 2020 WL 1307109 (N.D. Cal. 2020), As District Judge Chhabria recently stated, "We

4    should not be adding to the prison population during the COVID-19 pandemic if it can be avoided.

5    Several recent court rulings have explained the health risks—to inmates, guards, and the community

6    at large—created by large prison populations." *United States v. Garlock*, No. 18-CR-00418-VC-1,

7    2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (citing *United States v. Stephens*, No. 15-cr-95-

8    AJN, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020); *United States v. Barkman*, No. 3:19-cr-

9    0052-RCJ-WGC, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020); *In the Matter of*

10   *Extradition of Toledo Manrique*, No. 3:19-mj-71055-MAG-1 (TSH), 2020 WL 1307109 (N.D. Cal.

11   Mar. 19, 2020)).

12   Releasing Mr. Farca would accord with local efforts to de-densify Santa Rita Jail. *See* Megan

13   Cassidy, "Alameda County approves early release for nearly 250 inmates at Santa Rita Jail," San

14   Francisco Chronicle (March 19, 2020).[8] Moreover, Mr. Farca is among those who are vulnerable in

15   the prison population because his OCD and Misophonia make his ability to follow the guidelines set

16   by the CDC regarding handwashing and hygiene untenable. Mr. Farca's struggle to maintain

17   cleanliness is not new and, in fact, he was discharged from the military (and the pending federal

18   charges regarding false statements to the military brought two years later) following a dispute with

19   other recruits which arose because he had not bathed during his orientation.[9] The continued detention

20   of Mr. Farca unnecessarily puts his health at risk and the Court should release him with conditions.

21   **II.   The Court Should Release Mr. Farca Based upon his Low Advisory Guideline Range**

22   Mr. Farca is charged with making false statements to a government agency in violation of 18

23   U.S.C. § 1001(a)(2). It is alleged that Mr. Farca made a false statement in his application to the

24   military in 2017 (two years before he was charged) when he certified that he had not consulted with a

25

26   ────────────────

27   [8] Available at https://www.sfchronicle.com/crime/article/Alameda-County-approves-early-release-
     for-nearly-15144181.php.

28   [9] Mr. Farca was dismissed from the military following a fight after other recruits ridiculed Mr. Farca
     because he hadn't bathed and then either threatened, or actually attempted, to forcibly make him
     shower. As a result, Mr. Farca got into a physical altercation with a recruit and threatened the others.

1   health professional regarding an emotion or mental health condition within the proceeding 7 years

2   when in fact he had. Unsurprisingly, for Mr. Farca who has no criminal record, the guidelines for this

3   offense are very low. Specifically, defense counsel calculates Mr. Farca's advisory guideline range to

4   be 0-6 months after a guilty plea (which is what the parties have been trying to negotiate). Even the

5   government's guideline calculation, which presumes a greater loss amount and resulting offense level

6   two levels higher than that calculated by defense counsel, is low enough that alternatives to custody

7   are authorized even without a variance.[10]

8        Yet as of the filing of this motion, Mr. Farca will have spent more than 4 months in prison,

9   despite the fact that his defense counsel calculates his advisory guideline range after a guilty plea to

10  be 0-6 months custody. In addition, on Friday, March 27, 2020, the Court sua sponte continued Mr.

11  Farca's next district court appearance from April 3, 2020 to June 5, 2020, "in light of the continuing

12  COVID-19 health crisis." Dkt. 29. By that time, Mr. Farca will have been in custody for over 7

13  months. Should he change his plea to guilty at the next appearance, a presentence report will not be

14  prepared or sentencing scheduled until months later. This means that Mr. Farca will, at best, serve a

15  sentence of 10 months custody for a case in which defense counsel calculates his advisory guideline

16  range to be 0-6 months.[11]

17       At some point, prolonged pre-trial detention may become excessive and consequently punitive

18  so as to violate a person's right to due process afforded by the Fifth Amendment to the Constitution.

19  *United States v. Shareef*, 907 F.Supp. 1481, 1484 (D. Kan. 1995). One factor appropriate to consider

20  in assessing potential due process violations from prolonged pretrial detention is "the potential terms

21  of imprisonment to which the defendants may be sentenced if ultimately found guilty of the charges."

22  *Id. See also, United States v. Ailemen*, 165 F.R.D. 571, 581 (ND Cal. 1996)(noting that, in

23  considering due process challenges to pre-trial detention "some courts, in some circumstances, have

24  compared the length of the likely sentence faced by the defendant to the length of the pretrial

25  _____

26  [10] The parties have been unable to work out a plea agreement and the government may try to argue
    for an upward variance. However, the fact remains that the advisory guideline, which is the starting

27  point for all sentencing calculations, is low.
    [11] The government has continued producing discovery to Mr. Farca, including massive amounts of

28  information from his computers, and undersigned counsel has continued to review the discovery.
    Specifically, the case has not been prolonged because of a lack of diligence on the part of Mr. Farca.

1   detention (in general, the closer the length of pretrial detention gets to the probable sentence, the

2   more likely the courts are to find a due process violation.")); *United States v. Cos*, 2006 WL 4061168

3   at *11 (D.N.M. 2006)(unpublished)("That Cos has already served a meaningful portion of any

4   sentence he might receive if he were convicted calls into doubt the constitutional legitimacy of his

5   detention.")

6          In the present case, the Court should consider the fact that the advisory guideline range, even as

7   calculated by the government, is low enough that, should Mr. Farca remain in custody, he will be

8   forced to serve a sentence which, at best, constitutes an upward variance from defense counsel's

9   calculations, or a high-end sentence based upon the government's calculations. This fact should

10   weigh heavily in favor of the Court releasing Mr. Farca from custody with appropriate conditions.

11

12   **III.   Mr. Tibi Farca's Willingness to Be a Custodian is A Changed Circumstance and Release
        Conditions Can Be Set to Adequately Mitigate Any Danger**

13          As stated above, Mr. Farca's father, Tibi Farca, is willing to sign a bond for $10,000 and act as

14   a surety and custodian so long as his son lives with him in Woodland, California. This is a changed

15   circumstance. Although the initial Detention Order states that Mr. Farca's parents are not suitable

16   custodians, Dkt. 2, at the time of the hearing Mr. Tibi Farca was not willing to sign a bond and

17   therefore not proffered to the Court as either a custodian or surety. Mr. Farca had lived with his

18   mother for many years and the proposal was for him to continue living with his mother. Mr. Farca's

19   father would not agree to sign the bond under those conditions. As stated above, the government

20   previously pointed to two informational reports which Mr. Farca's father had filed years before, in

21   support of its argument that Mr. Farca was a danger. However, the fact that Mr. Farca's father filed

22   the reports and brought his son's conduct to the attention of appropriate authorities, should give the

23   Court confidence that his father will be vigilant in ensuring that Mr. Farca abides by his conditions of

24   release or will report him to the Court if he fails to do so.

25          Furthermore, any risk of danger can be sufficiently addressed through additional release

26   conditions which would include Mr. Farca living with his father, curtailing his access to the internet,

27   requiring mental health treatment and counseling, participating in a day program such as EBRC or

28   other appropriate program, and participating in cognitive behavioral therapy, including classes which

could address anger management and tolerance. Undersigned counsel understands the basis for the magistrate judge's findings. However, changed circumstances exist, and release conditions may be set, which will reasonably assure that Mr. Farca not pose a danger to the community. Mr. Farca no longer has access to guns or other weapons, his ability to communicate with others can be limited and monitored as well. Furthermore, his racist views and the danger they pose, while despicable, are not immutable.[12] For these reasons as well, conditions of release should be set.

## CONCLUSION

For all of the reasons described above, Mr. Farca asks the Court to release him from custody and he promises to abide by any and all conditions which the Court deems to be necessary.

Dated:      March 30, 2020

Respectfully submitted,

STEVEN G. KALAR
Federal Public Defender
Northern District of California

/S
_____
JOYCE LEAVITT
Assistant Federal Public Defender

---

[12] People's racist views can be changed through education as proven by Daryl Davis, and further described in a 2016 documentary entitled *Accidental Courtesy: Daryl Davis, Race & America Daryl Davis*. *See* trailer at https://accidentalcourtesy.com Mr. Davis, an African American musician, met and befriended members of the KKK and through trust and discourse, caused an estimated 40 – 60 members to leave the KKK, including Imperial Wizard Roger Kelly, who gave Mr. Davis his robe. Education, rather than incarceration, will have an impact on Mr. Farca's views and reduce his risk of danger.