1   STEVEN G. KALAR
    Federal Public Defender
2   Northern District of California
    JOYCE LEAVITT
3   Assistant Federal Public Defender
    13th Floor Federal Building - Suite 1350N
4   1301 Clay Street
    Oakland, CA 94612
5   Telephone:   (510) 637-3500
    Facsimile:    (510) 637-3507
6   Email:        Joyce_Leavitt@fd.org

7

8   Counsel for Defendant Farca

9

10                  IN THE UNITED STATES DISTRICT COURT

11              FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                          OAKLAND DIVISION

13

14   UNITED STATES OF AMERICA,            **Case No.:** CR 19–00643 JST

15              Plaintiff,                **DEFENDANT'S SENTENCNG
                                          MEMORANDUM**
16        v.

17   ROSS ANTHONY  FARCA,                 **Hearing Date:**   May 28, 2020
                                          **Hearing Time:**   12:45 p.m.
18              Defendant.

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 3

I.     The advisory guideline range should be 0 to 6 months because the government cannot carry its burden of establishing a loss amount of more than $40,000 ................... 3

     A.     Legal background ........................................................................................ 3

     B.     The government has to prove loss amount by clear and convincing evidence ....................................................................................................... 4

     C.     Under either standard, the government cannot prove more than $40,000 of loss ......................................................................................................... 5

     D.     The PSR's "average" training cost figures plainly do not apply to Mr. Farca ..... 6

     E.     The VIS loss calculation is legally and factually incorrect ................................. 7

     F.     The government cannot show that all of the claimed losses were actually losses ...................................................................................................... 9

II.     A sentence of "time-served" is sufficient to meet the goals of sentencing .................... 11

     A.     Mr. Farca's Age at the Time of the Offense ..................................................... 11

     B.     The Nature and Circumstances of the Offense .................................................. 13

     C.     Mr. Farca's History and Characteristics .......................................................... 13

     D.     Mr. Farca's Health Vulnerability In Light of the COVID-19 Pandemic is Another Reason to Impose A Sentence of Time Served .................................... 15

III.     The Court cannot impose restitution as indicated by the PSR ...................................... 16

     A.     Requiring restitution would violate Mr. Farca's Sixth Amendment rights ........ 16

     B.     The MVRA does not apply to Mr. Farca's offense ............................................ 17

     C.     Any restitution the Court orders must be limited to losses caused by Mr. Farca's conviction conduct ........................................................................... 18

IV.     The government cannot carry its burden of establishing that the computer/Internet special conditions are legal or necessary ..................................................................... 19

     A.     Legal Background ........................................................................................ 19

     B.     The Court should not impose the requested complete ban on Internet access (Condition 8) ............................................................................................... 20

1

2

C.    The Court should not impose the requested ban on possessing or using any device capable of accessing the Internet or storing data (Condition 6) ............. 21

D.    The Court should not impose the requested ban on possession or use of "any data encryption technique or program." (Condition 10) .................................... 22

E.    Mr. Farca does not object to a properly tailored and specific search condition, but the Court should not imposed the requested multiple overlapping search and monitoring special conditions (Conditions 5, 7, 9) .............................................. 22

F.    Imposition of the most-restrictive Internet and computer special conditions would violate constitutional principles of anti-delegation ................................. 23

CONCLUSION ............................................................................................................................ 25

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Federal Cases**                                                                    **Page(s)**

*Apprendi v. New Jersey*,
  530 U.S. 466 (2000) ............................................................................................. 16

*Burrage v. United States*,
  571 U.S. 204 (2014) ............................................................................................... 9

*California v. Brown*,
  479 U.S. 538 (1987) ............................................................................................. 13

*Ex parte United States*,
  242 U.S. 27 (1916) ............................................................................................... 23

*Gall v. United States*,
  552 U.S. 38 (2007) ............................................................................................... 11

*Graham v. Florida*,
  560 U.S. 48 (2010) ............................................................................................... 12

*In re the Extradition of Manrique*,
  2020 WL 1307109 (N.D. Cal. 2020) ................................................................... 16

*Kimbrough v. United States*,
  552 U.S. 85 (2007) ............................................................................................... 11

*Miller v. Alabama*,
  567 U.S. 460 (2012) ............................................................................................. 12

*Packingham v. North Carolina*,
  137 S. Ct. 1730 (2017) ......................................................................................... 20

*Rita v. United States*,
  551 U.S. 338 (2007) ............................................................................................. 11

*Roper v. Simmons*,
  543 U.S. 551 (2005) ............................................................................................. 12

*S. Union Co. v. United States*,
  567 U.S. 343 (2012) ............................................................................................. 16

*Thompson v. Okla.*,
  487 U.S. 815 (1988) ....................................................................................... 12, 13

*United States v. Allison*,
  86 F.3d 940 (9th Cir. 1996) ................................................................................... 4

*United States v. Alphas*,
  785 F.3d 775 (1st Cir. 2015) ......................................................................... 10, 11

*United States v. Bad Marriage*,
  392 F.3d 1103 (9th Cir. 2004) ............................................................................. 16

*United States v. Bare*,
  806 F.3d 1011 (9th Cir. 2015) ............................................................................. 22

*United States v. Barsumyan*,
517 F.3d 1154 (9th Cir. 2008) ................................................................................... 21

*United States v. Batson*,
608 F.3d 630 (9th Cir. 2010) ..................................................................................... 17

*United States v. Blair*,
933 F.3d 1271 (10th Cir. 2019) .................................................................................. 24

*United States v. Blitz*,
151 F.3d 1002 (9th Cir. 1998) ..................................................................................... 4

*United States v. Booker*,
543 U.S. 220 (2005) .................................................................................................. 11

*United States v. Cantrell*,
433 F.3d 1269 (9th Cir. 2006) ................................................................................... 11

*United States v. Carty*,
520 F.3d 984 (9th Cir. 2008) ..................................................................................... 11

*United States v. Collins*,
854 F.3d 1324 (11th Cir. 2017) ................................................................................. 17

*United States v. De La. Fuente*,
353 F.3d 766 (9th Cir. 2003) ..................................................................................... 17

*United States v. Dorcely*,
454 F.3d 366 (D.C. Cir. 2006) .................................................................................. 18

*United States v. Esparza*,
552 F.3d 1088 (9th Cir. 2009) ................................................................................... 24

*United States v. Forrest*,
764 F. App'x 601 (9th Cir. 2019) .............................................................................. 22

*United States v. Garcia-Sanchez*,
189 F.3d 1143 (9th Cir. 1999) ..................................................................................... 4

*United States v. Garlock*,
2020 WL 1439980 (N.D. Cal. Mar. 25, 2020) .......................................................... 16

*United States v. Green*,
722 F.3d 1146 (9th Cir. 2013) ................................................................................... 16

*United States v. Griffin*,
2018 WL 2320943 (D. Or. 2018) ............................................................................ 7, 8

*United States v. Hicks*,
217 F.3d 1038 (9th Cir. 2000) ..................................................................................... 9

*United States v. Kennedy*,
643 F.3d 1251 (9th Cir. 2011) ................................................................................... 18

*United States v. Kitchen*,
786 F. App'x 78 (9th Cir. 2019) ............................................................................... 22

*United States v. Kuo*,
620 F.3d 1158 (9th Cir. 2010) .............................................................................. 18, 19

*United States v. Lacoste,*
   821 F.3d 1187 (9th Cir. 2016) ................................................................. 20, 21

*United States v. Lam Thanh Pham,*
   545 F.3d 712 (9th Cir. 2008) ........................................................................ 7, 8

*United States v. Luis,*
   765 F.3d 1061 (9th Cir. 2014) ........................................................................ 17

*United States v. Martin,*
   796 F.3d 1101 (9th Cir. 2015) ........................................................................ 10

*United States v. Miell,*
   744 F. Supp. 2d 961 (N.D. Iowa 2010) ........................................................ 18

*United States v. Musa,*
   742 F. App'x 265 (9th Cir. 2018) .................................................................... 4

*United States v. Pemberton,*
   904 F.2d 515 (9th Cir. 1990) ............................................................................ 7

*United States v. Peterson,*
   538 F.3d 1064 (9th Cir. 2008) ........................................................................ 17

*United States v. Pirtle,*
   158 F. App'x 878 (9th Cir. 2005) .................................................................... 17

*United States v. Ritchie,*
   858 F.3d 201 (4th Cir. 2017) .......................................................................... 17

*United States v. Sales,*
   476 F.3d 732 (9th Cir. 2007) ................................................................ 20, 21, 22

*United States v. Savastio,*
   777 F. App'x 4 (2d Cir. 2019) ........................................................................ 23

*United States v. Scott,*
   316 F.3d 733 (7th Cir. 2003) .......................................................................... 24

*United States v. Snowden,*
   806 F.3d 1030 (10th Cir. 2015) ...................................................................... 10

*United States v. Stephens,*
   374 F.3d 867 (9th Cir. 2004) .......................................................................... 17

*United States v. Stephens,*
   424 F.3d 876 (9th Cir. 2005) .................................................................... 23, 24

*United States v. Torlai,*
   728 F.3d 932 (9th Cir. 2013) .......................................................................... 10

*United States v. Ullmann,*
   788 F.3d 1260 (10th Cir. 2015) ...................................................................... 23

*United States v. Valle,*
   940 F.3d 473 (9th Cir. 2019) ........................................................................ 4, 5

*United States v. Wolf,*
   699 F.3d 1082 (9th Cir. 2012) ........................................................................ 24

DEFENDANT'S SENTENCNG MEMORANDUM
*FARCA*, CR 19–00643 JST

**Federal Statutes**

18 U.S.C. § 16 ........................................................................................................ 17

18 U.S.C. § 1001 ...................................................................................... 1, 3, 17, 18

18 U.S.C. § 1621 .................................................................................................... 18

18 U.S.C. § 3553 .............................................................................................. *passim*

18 U.S.C. § 3583 ...................................................................................... 19, 22, 24

18 U.S.C. § 3663 .............................................................................................. 17, 18

**Other**

U.S.S.G. § 1B1.3 ..................................................................................................... 9

U.S.S.G. § 2B1.1 ............................................................................................. *passim*

**INTRODUCTION**

Defendant Ross Farca will appear before this Court on May 28, 2020, for sentencing after having pled guilty to a violation of 18 U.S.C. § 1001(a)(2) – false statement to a government agency. In the Presentence Report disclosed on May 15, 2020 (PSR), the probation officer calculates the advisory guideline range to be 6 to 12 months and recommends a sentence of "time served" followed by three years of supervised release. PSR, Sentencing Recommendation. Mr. Farca, who has already served more than 6 months in custody on this case following his arrest on November 21, 2019, agrees that a "time served" sentence is appropriate.

Mr. Farca disagrees with the probation officer's guideline calculation and believes that the advisory range should be 0 to 6 months custody because the government cannot demonstrate that the loss to the Army exceeded $40,000. Irrespective of what the Court determines to be the appropriate loss amount, however, no additional time in custody should be imposed. A "time served" sentence is appropriate based upon the advisory guidelines as well as the factors under 18 U.S.C. § 3553(a).

Mr. Farca asks the Court to sentence him to a sentence of "time served" followed by a term of supervised release. He further asks the Court to determine that the loss amount in this case is less than $40,000. He believes restitution is legally improper on the basis recommended by the PSR and unwarranted otherwise. Finally, he asks the Court to refrain from imposing all the overlapping and overly broad special conditions of supervision recommended in the PSR that relate to Mr. Farca's access to digital devices and the Internet. This sentencing memorandum supports his requests. The declaration of Madeline Larsen ("Larsen Decl.") is being filed concurrently, and attached hereto is a letter from Mr. Farca's father, Tibi Farca (Exhibit A).

**BACKGROUND**

Ross Farca is 24 years old. PSR ¶ 48. He was born in the United States but his parents moved to Romania, where they are originally from, when Mr. Farca was 2 months old. *Id*. ¶ 42. The family remained in Romania until Mr. Farca was three and a half years old, when they moved back to the United States and settled in California. *Id*. As the PSR notes, there were many traumatic events in Mr. Farca's childhood that made life difficult for him. For example, when he first returned to the United States, he did not speak English. *Id*. ¶ 43. Mr. Farca did not become proficient in English until he was

in third grade and was ridiculed by others who could not understand him. *Id*. In addition, Mr. Farca's first grade teacher recommended that Mr. Farca be brought to a doctor, Exhibit A at p.2, where he was diagnosed with Pervasive Developmental Disorder[1] at the age of five. Exhibit A at p.2. Mr. Farca was later diagnosed with an Autistic Disorder, Aspergers Syndrome, when he was seven years old.[2] *Id*. ; PSR ¶¶ 50. With both his limited English and his mental health disabilities at play, the transition for Mr. Farca when his family returned to the United States from Romania was difficult.

As he grew older, Mr. Farca continued to struggle with his mental health disabilities. In addition to autism, Mr. Farca suffers from Obsessive-Compulsive Disorder (OCD) as well as Misophonia, an auditory disorder in which certain sounds trigger an emotional or physiological response. PSR ¶¶ 50, 51. Mr. Farca's OCD compulsions have impacted his life tremendously. *Id*. ¶ 51. In addition, the Misophonia is difficult for Mr. Farca because of his reaction to sounds that he can't always avoid and that cause him pain, including the sounds of dripping water, the clicking of the hammer when the water stops and the television. *Id*. ¶49. Mr. Farca continues to be mocked and mistreated by others because of his disabilities.

Throughout his educational years, Mr. Farca, who is very bright, attended special education classes and received services through different programs, such as the Regional Center of the East Bay. PSR ¶55; Exhibit A at pp.2-3. Following graduation, one of his treatment goals was to obtain a part-time job or supportive employment. Exhibit A at p.3. He therefore applied to various jobs, including enlisting in the United States Army in 2017, when he was 21 years old. *Id*. Mr. Farca was accepted into the Army and reported on August 28, 2017. He was arrested a few days later after a fight with a fellow trainee, and discharged on October 3, 2017 for "failed medical/physical/procurement standards." *Id*. ¶ 8.

Two years later, in June 2019, when he was 23 years old, Mr. Farca was investigated by the Concord police after making statements in a chat room on an online video game website that were

---

[1] Pervasive Developmental Disorder refers to a group of disorders characterized by delays in the development of socialization and communication skills, including Autism.

[2] Asperger Syndrome is defined on MedicineNet.com as a pervasive developmental disorder that is characterized by an inability to understand how to interact socially. It is most notable for the often great discrepancy between the intellectual and social abilities of those who have it.

perceived to be Anti-Semitic threats. *Id*. ¶ 36. During that investigation, the Concord police searched Mr. Farca's residence and found paperwork relating to his Army discharge. The federal government then decided to charge Mr. Farca with making false statements to a government agency based upon his 2017 application to the Army. That application from three years ago forms the basis of the current charges for which Mr. Farca will be sentenced by this Court.

Mr. Farca, who has no prior criminal convictions, has been in custody at Santa Rita jail for more than six months since his arrest in this case on November 21, 2019. While being in custody is difficult for anyone, for Mr. Farca, who has serious mental health disabilities and is trying to survive in custody during a pandemic, it has been unbearable. Mr. Farca has learned his lesson. He needs no additional time in custody.

## ARGUMENT

### I. The advisory guideline range should be 0 to 6 months because the government cannot carry its burden of establishing a loss amount of more than $40,000

The base offense level for Mr. Farca's 18 U.S.C. § 1001 offense is 6. PSR ¶ 22; U.S.S.G. § 2B1.1(a)(2). The PSR recommends an additional four offense levels, for more than $40,000 of loss, for a total offense level of 12. PSR ¶¶ 23, 27; U.S.S.G. § 2B1.1(b)(1)(D). The government cannot carry its burden of showing that more than $40,000 in loss is attributable to Mr. Farca. The government's calculation (1) fails to take into account the particular facts of Mr. Farca's specific enlistment category and (2) includes fixed costs of Army operations that were in no way caused by Mr. Farca's conduct. The loss attributable to Mr. Farca is less than $40,000, and his Guidelines range should be increased by no more than four levels, representing a loss to the Army of between $15,000 and $40,000. U.S.S.G. § 2B1.1(b)(1)(C). This would put Mr. Farca's total offense level (including the two-level reduction for acceptance of responsibility, PSR ¶ 29) at eight.

#### A. Legal background

Under the Guidelines, "loss is the greater of actual or intended loss." U.S.S.G. § 2B1.1, comment. (n.3(A)). Actual loss is "the reasonably foreseeable pecuniary harm that resulted from the offense," i.e., the pecuniary "harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." U.S.S.G. § 2B1.1, comment. (n.3(A)(i), (iii)). "'Pecuniary harm' means harm that is monetary or that otherwise is readily measurable in

1  money." U.S.S.G. § 2B1.1, comment. (n.3)(iii)).  Loss does not include interest, finance charges, late

2  fees, penalties, etc.  comment. U.S.S.G. § 2B1.1, comment. (n.3(D)(i)).

3  "The court need only make a reasonable estimate of the loss." U.S.S.G. 2B1.1, comment.

4  (n.3(C)). But it must insure that "the information underlying the estimate possesses sufficient indicia

5  of reliability to support its probable accuracy." *United States v. Garcia-Sanchez*, 189 F.3d 1143, 1149

6  (9th Cir. 1999); *accord United States v. Musa*, 742 Fed. Appx. 265, 267 (9th Cir. 2018)

7  (unpublished) (remanding because record did not adequately demonstrate method of determining loss

8  was "sufficiently reliable"). "[I]n calculating loss in fraud cases, the sentencing court should take a

9  realistic, economic approach to determine what losses the defendant truly caused or intended to

10  cause, rather than the use of some approach which does not reflect the monetary loss." *United States*

11  *v. Allison*, 86 F.3d 940, 943 (9th Cir. 1996). This principle means that a sentencing court "should not

12  ascribe a larger loss to the defendants than they intended to or actually did inflict."  *United States v.*

13  *Blitz*, 151 F.3d 1002, 1010 (9th Cir. 1998).

14              **B.       The government has to prove loss amount by clear and convincing evidence**

15          The government bears the burden of proving the factual bases for sentencing enhancements.

16  *United States v. Valle*, 940 F.3d 473, 481 (9th Cir. 2019). Although its burden ordinarily is by a

17  preponderance of the evidence, it "must meet a higher standard -- proof by clear and convincing

18  evidence -- in cases where there is an extremely disproportionate impact on the sentence." *Id*. at 479

19  (internal quotation marks omitted). Of the six factors the Ninth Circuit has identified as relevant to

20  assessing disproportionate impact, the most significant are (1) "whether the increase in the number of

21  offense levels is less than or equal to four" and (2) "whether the length of the enhanced sentence

22  more than doubles the length of the sentence authorized by the initial sentencing guideline range in a

23  case where the defendant would otherwise have received a relatively short sentence." *Id*.

24          Both factors apply to the loss amount in this case. The PSR's proposed loss amount would

25  increase Mr. Farca's offense level by six levels over the base offense level of 6. PSR ¶¶ 22, 23. And it

26  would more than double the length of the sentence authorized by the base offense level of 6, from 0-6

27  months to 6-12 months. His sentencing range, in the upper left-hand corner of the Guidelines

28  sentencing table, is indisputably "relatively short." The government should be required to prove the

1   loss amount by clear and convincing evidence.

2              **C.**      **Under either standard, the government cannot prove more than $40,000 of**

**loss**

The two relevant fundamentals from the legal principles above are that, for the Court to increase a defendant's sentence based on a loss amount, the government must show at least by a preponderance of the (reliable) evidence (1) the victim suffered a loss and (2) the defendant's offense conduct caused that loss.

The PSR's loss calculation is based on a one-page "Information Paper" prepared by the Army and provided by the government ["2018 Paper"]. (Bates RF-00032); *see* PSR ¶¶ 9-10, 23 (discussing loss). The Army prepares these Information Papers at the beginning of every fiscal year by dividing the budget figures for each of the three categories (USAREC, USMEPCOM and TRADOC) by the number of recruits ("accessions achieved," 2018 Paper ¶ b). Larsen Decl. ¶¶ 5-9. Its figures thus represent the army's costs in each category amortized over the recruit pool. *Id.* ¶ 5. Nothing in the Information Paper is specific to Mr. Farca or his particular situation. *Id.* ¶ 12.

The first problem with the PSR's loss calculation is that is based on budget figures from the wrong fiscal year. The PSR relies on budget numbers from the 2018 Paper, dated October 26, 2018, for "FY18." 2018 Paper. But Mr. Farca made the false statement in June 2017, was accepted into the Army and reported for basic training in August 2017, and was discharged from the Army on October 3, 2017. PSR ¶¶ 6, 8. Because his conviction conduct and all but three days of his time in the Army occurred during fiscal year 2017, the relevant budget figures are the analogous figures from that year, which are lower than the ones from fiscal year 2018. *See* Ex. 1 to Larsen Decl ["2017 Paper"]. As discussed below, the Army's Victim Impact Statement ["VIS"] uses the figures from 2017.[3]

Based on the 2018 Paper, the PSR calculates "the cost from first contact, the start of basic training, and up until his early discharge, is approximately $44,737." PSR ¶ 10. The PSR comes up with this $44,737 loss amount by adding the highlighted amounts listed in the 2018 Paper for (1) "The Regular Army 'Cost per Accession'" of $25,337; (2) "The approximate total cost to process one accession through USMEPCOM" of $1,800; and (3) "Average Cost per Graduate . . . BCT" of

---

[3] The probation officer did not have the VIS or the 2017 Paper when he prepared the PSR.

$17,600.  2018 Paper ¶ 2(b), (c), (d)).  $25,337 + $1,800 + $17,600 = $44,737.  The analogous figure for fiscal year 2017 is $24,526 + $1,681 + $18,200 = $44,407.  2017 Paper.

This $40,000+ loss amount is wrong for three main reasons. First, it is inconsistent with the loss calculation in the VIS, which itself is not a legally correct calculation of the Army's loss. Second, the PSR calculation includes in the loss amount, as money the Army spends *on average* to process a new recruit, money the Army never spent or even would have spent on Mr. Farca. Finally, some of the money the PSR and VIS include as loss simply was not loss -- for example, testing, leases, military and civilian pay and advertising -- which the military would have paid even absent Mr. Farca's false statement.

### D.  The PSR's "average" training cost figures plainly do not apply to Mr. Farca

The PSR calculation includes, for paragraph (d) of the 2018 Paper, the figure for the "Average Cost per Graduate" for "BCT" of $17,600.  2018 Paper; PSR ¶ 10.  In addition to being from the wrong fiscal year, this figure alone incorporates two errors.

First, as indicated in paragraph 2(a) of the 2017 Paper, there are two basic alternatives for training new Army recruits.  2017 Paper. The first, "for military occupational specialties (MOS) attending Basic Combat Training (BCT)/Advanced Individual Training (AIT)," has an average cost of $73,700. *Id*. The second, for "One Station Unit Training (OSUT) MOS," has an average cost of $55,300. *Id*. The VIS establishes that Mr. Farca attended OSUT. VIS. Thus, the PSR calculation should have been based not on the BCT number for paragraph d ($17,600, PSR ¶ 10) but instead on the OSUT total in paragraph d, which, for 2017, was $28,500. 2017 Paper.

Second, and more critically, the PSR is wrong in claiming that its loss calculation covers the period only "until [Farca's] early discharge." PSR ¶ 10. The Army Information Paper on which the PSR's calculations rely provides average costs for new Army recruits "from the time the individual walks into a recruiting center *until the recruit reaches their first duty station*." 2018 Paper (emphasis added). But Mr. Farca did not make it to his "first duty station." He completed only 36 days of the 16-week (112-day) OSUT training. VIS. The VIS calculates the cost to the Army of the portion of OSUT Mr. Farca actually completed as $17,7832. VIS. Thus, even accepting the PSR's figures for

1   the other categories, PSR ¶ 10 (but for the correct fiscal year) -- $24,526 and $1,681, 2017 Paper --

2   the total cost to the Army for Mr. Farca would be just under $44,000 ($24,526 + $1,681 + $17,832).

3          Moreover, some of the other categories included in the "average cost" clearly did not apply to,

4   or would have been less than average for, Mr. Farca. 2017 Paper ¶¶ 2(b), (c), (d). For example, he did

5   not participate in the "Loan Repayment Program." Id. ¶ 2(b); Larsen Decl. ¶ 17.  The cost to process

6   his Army application would have been less than average because it did not need to include any

7   expenses for his travel to the enlistment station. 2017 Paper ¶ 2(c); Larsen Decl. ¶ 17.  Moreover,

8   because Mr. Farca did not move beyond the Reception Battalion to basic training, it would be

9   reasonable to say that the Army's spending on his training was less than average.  2017 Paper ¶ (d);

10  Larsen Decl. ¶ 12.

11                  **E.      The VIS loss calculation is legally and factually incorrect**

12         The VIS's claim of a "total financial loss to the Government" of $92,768 is different from the

13  PSR's loss calculation. The VIS apparently added the Army's cost "to find another recruit to replace

14  Mr. Farca" ($55,300) to the cost of the days it did not spend training Mr. Farca ($493 per day x 76

15  days = $37,468):  $55,300 + $37,468 = $92,768. This is double-counting. Had Mr. Farca *not* been

16  removed from the Army, the Army would have spent the $37,468 to continue his training, but it

17  would *not* have had to spend the $55,300 to replace him. Because Mr. Farca *was* removed from the

18  Army, the Army may have had to spend $55,300 to replace him, but it did not *also* have to spend

19  $37,468 to continue his training. *See United States v. Pham*, 545 F.3d 712, 718 (9th Cir. 2008)

20  (discussing out-of-circuit cases finding erroneous double-counting "where the same fraudulent check

21  or stolen credit card is erroneously counted twice in estimating the total loss attributable to a

22  defendant" and the double-counting results in a higher guideline range).

23         In *United States v. Pemberton*, 904 F.2d 515, 516 (9th Cir. 1990), for example, the Ninth

24  Circuit affirmed a loss amount equal to 80% of the commission cost for the stolen landscaping-design

25  drawings that the defendant was convicted of receiving, because the drawings were 80% complete

26  when they were stolen. Had the loss in *Pemberton* been calculated in a way that was analogous to the

27  Army's loss calculation here, it would have been the remaining 20% of the commission cost plus the

28  full cost to start all over with new drawings. And in *United States v. Griffin*, 2018 WL 2320943, at

**6-7 (D. Or. 2018) (unpublished), the district court considered both the loss to the gallery to which the defendant fraudulently sold a stolen painting and the loss to the trust that owned the stolen painting. The former was what the gallery paid for the painting, *id*., at *6; the latter was "the retail fair market value (or replacement cost) of the painting." *Id*., at *7. "It would be inappropriate, however, to double-count the retail fair market value of the painting (the loss to its owner) plus the intended loss to the New York art gallery." *Id*. Instead, the district court based the loss amount on the greater of these two amounts, which was the fair market value. *Id*.

The Guidelines commentary also appears to have rejected replacement cost as a suggested measure of loss. Two earlier versions of the § 2B1.1 loss definition included "replacement cost" as an option. U.S.S.G. § 2B1.1, comment. (n.2) (pre-1988 Amendments); U.S.S.G. § 2B1.1, comment. (n.2) (1988 Amendment).  But the 2001 amendments to the § 2B1.1 commentary eliminated all the reference to replacement cost as a measure of loss.

In fact, the government cannot show that the Army spent any money to replace Mr. Farca. The Army does not have the ability to fill a vacancy once a new recruit has started basic training.  Larsen Decl. ¶ 14. The Army also plans for an attrition rate for new recruits of 12%. *Id.* ¶ 13. In 2017, when Mr. Farca enlisted, the Army brought in more recruits than its target goal. *Id*. ¶ 19. In fact, it raised its goal mid-year and exceeded even that increased goal.  *Id*. ¶¶ 19-20. The government cannot carry its burden of establishing that the VIS's claimed loss of $55,300 "to find another recruit to replace Mr. Farca" is, in fact, a loss.

In short, the government cannot show that the Army actually spent any money on Mr. Farca -- let alone $37,468 -- after he left the Army.  VIS.  It cannot show that it spent $55,300 to replace Mr. Farca and legally would not be entitled to that amount in loss even if it had done so.  Based on the VIS, the loss to the Army should be, at most, the $17,832 the average cost of recruiting and training for the 36 days Mr. Farca was actually on active duty.[4]   VIS.

Even that amount is only loosely related to Mr. Farca's conviction conduct of making a false

---

[4] The Army cannot claim loss for any non-pecuniary harm, such as "the morale and recruit production momentum of recruiters."  VIS; *see Pham*, 545 F.3d at 716-17 ("'Pecuniary harm' . . . 'does not include . . . harm to reputation, or other non-economic harm.'"; quoting U.S.S.G. § 2B1.1, comment. (n.3(A)(iii))).

statement on his Army application. Mr. Farca made the false statement in June 2017 and started his

Army training in August 2017. PSR ¶¶ 6-8. He was discharged in October 2017 after he assaulted

another trainee. PSR ¶ 8. The PSR notes that "the discharge paperwork cited 'failed

medical/physical/procurement standards' and noted 'erroneous enlistment; medical condition

disqualifying for military service, with no medical waiver approved.'" *Id*. But the Army codes on his

paperwork indicate that he was released from the Army for "Convenience of the Government" and

not for medical or mental health reasons or because of a fraudulent enrollment. Larsen Decl. ¶¶ 17-18.

       **F.**      **The government cannot show that all of the claimed losses were actually losses**

The government also cannot carry its burden of establishing that Mr. Farca caused more than

$40,000 of loss to the Army because each of the three categories of costs incorporated in both the

PSR's and the VIS's calculations of loss includes fixed costs that (1) were not losses and (2) did not

result from his conduct.

The Guidelines' requirement that a sentence "be based on 'all harm that resulted from the acts

or omissions' of the defendant," U.S.S.G. § 1B1.3(a)(3), requires proof of causation. *United States v.*

*Hicks*, 217 F.3d 1038, 1048 (9th Cir. 2000). The government must "prove by a preponderance of the

evidence the amount of harm that resulted from the acts or omissions of the defendant." *Id*. at 1049

(internal quotation marks omitted). The "results from" requirement means "actual causality," which

generally means proof that harm would not have occurred absent the defendant's conduct. *Burrage v.*

*United States*, 571 U.S. 204, 210-11 (2014).

The 2018 Paper on which the PSR relies includes costs that go far beyond those that resulted

from Mr. Farca's harm to the Army. For example, the $25,337 cost in paragraph 2(b) "includes . . .

funding for "all Military support personnel . . . Civilian Pay, Advertising, Recruiter Support . . .

Automated Data Processing . . . and Communications."  2018 Paper; Larsen Decl. ¶ 7. The $1,800

cost in paragraph 2(c) "includes . . . "personnel costs (including military payroll), and facilities costs

(including leases, utilities, heating, ventilation, air conditioning (HVAC), and security." 2018 Paper

¶ 2(c); Larsen Decl. ¶ 8. And the cost in paragraph 2(d) "include[s] fixed and variable costs . . . pay

and non-pay for direct instruction and training overhead, pay and non-pay for indirect support (e.g.,

1    base support, medical, family housing)." 2018 Paper ¶ 2(d); *see* Larsen Decl. ¶ 9. The VIS's base

2    figure of $55,300 for OSUT incorporates these same three categories of costs from the 2017 Paper.

3    VIS; *see* 2017 Paper ¶ 2(a) (citing "$55.3K in costs for One Station Unit Training" which "includ[e]

4    those from US Army Recruiting Command (USAREC), US Military Entrance Processing Command

5    (USMEPCOM), and US Army Training and Doctrine Command (TRADOC)").

6         These regular costs of running the Army are not a "pecuniary harm." U.S.S.G. § 2B1.1,

7    comment. (n.3(A)(i), (iii)). And Mr. Farca's conduct in no way caused the Army to incur these

8    ordinary expenses. Including these costs in the loss amount for Mr. Farca's false-statement offense

9    would be like holding a bank robber liable for the cost of the bank's rent. The Army had to pay its

10   employees and its overhead whether or not Mr. Farca made his false statement.

11        Mr. Farca is not aware of any case that bases Guidelines loss on a victim's analogous ordinary

12   expenses. On the contrary, in *United States v. Snowden* the court rejected a loss calculation that went

13   beyond the "pecuniary harm" caused by defendant's conduct.  806 F.3d 1030, 1032-33 (10th Cir.

14   2015). The defendant in *Snowden* stole a database that cost the company $1.5 million to develop.  *Id.*

15   at 1033. The Tenth Circuit rejected the district court's actual-loss calculation that included the

16   company's cost in making the database.  *Id.* "[T]he guideline requires proof of *loss*, and the guideline

17   commentary does not depart from that approach." *Id.* (emphasis in original). "'Loss' is the key, and

18   the development cost was not adequately tied to any loss actually suffered by" the victim company.

19   *Id.* (affirming because loss-calculation error was harmless).

20        Although this is not a government-benefits case, its circumstances are somewhat analogous to

21   "unilateral government assistance," *United States v. Martin*, 796 F.3d 1101, 1109 (9th Cir. 2015), and

22   some of the principles in the Guidelines commentary for calculating loss in these cases may be

23   instructive.  U.S.S.G. § 2B1.1, comment. (n.3(F)(ii)). In these cases, "[o]nly the illegitimate portion

24   of the value of the government benefits should be included in the loss calculation." *United States v.*

25   *Torlai*, 728 F.3d 932, 940 (9th Cir. 2013) (citing U.S.S.G. § 2B1.1, comment. (n.3(F)(ii)); *see also*

26   *United States v. Alphas*, 785 F.3d 775, 781 (1st Cir. 2015) ("the loss itself . . . is limited to the

27   tangible economic loss of the victim."). "Under the sentencing guidelines, loss generally does not

28   include sums that a victim would have paid to the defendant absent the fraud." *Alphas*, 785 F.3d at

1    781.

2          The government here cannot carry its burden of showing that the full amount in each of the

3    three categories in the 2017 Paper was a loss resulting from Mr. Farca's conduct. The Army did not

4    "lose" its normal expenses for things like military and civilian payroll and operating a recruiting

5    station. Mr. Farca's false statement certainly did not cause the Army to incur these ordinary expenses.

6    Under either the PSR or the VIS loss calculation, the government cannot carry its burden of

7    establishing a loss to the Army of more than $40,000.

8    **II.    A sentence of "time-served" is sufficient to meet the goals of sentencing**

9          The Supreme Court's decisions over the last decade have dramatically altered the district

10   court's role at sentencing. *See United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United*

11   *States*, 552 U.S. 85 (2007); *Gall v. United States*, 552 U.S. 38 (2007). Taken together, these cases

12   make it clear that district court judges now have the ability – as well as the duty – under 18 U.S.C. §

13   3553 to exercise judgment and discretion in arriving at a sentencing determination. Although "district

14   courts still 'must consult [the] Guidelines and take them into account when sentencing,'" *United*

15   *States v. Cantrell*, 433 F.3d 1269, 1279 (9th Cir. 2006) (quoting *Booker*, 543 U.S. at 224), they "may

16   not presume that the Guidelines range is reasonable," *Gall*, 552 U.S. at 50 (citing *Rita v. United*

17   *States*, 551 U.S. 338 (2007)). Furthermore, the guideline range may not be weighed more heavily

18   than any other statutory factor.  *Gall*, 552 U.S. at 50; *Carty*, 520 F.3d at 991.

19         In this case, the factors described in 18 U.S.C. § 3553, as well as the advisory guidelines,

20   support imposition of a "time served" sentence. Some of these factors are discussed below.

21                          **A.      Mr. Farca's Age at the Time of the Offense**

22         Mr. Farca was 21 years old at the time of the offense.  Although people are deemed adults

23   when they turn 18 years old, the U.S. Sentencing Commission ("U.S.S.C.") has recognized

24   neurological research that shows brain development is not fully realized in most people until they

25   turn 25 years old.  More specifically, researchers have found that the prefrontal cortex of the brain—

26   which "is utilized in impulse control, emotional reactions, executive function and decision

27   making"—is the last part of the brain to develop.  It "is not complete by the age of 18  . . .

28   development continues into the 20s" and "most researchers reference 25 as the average age at which

full development has taken place."[5]  In other words, research shows that the brain of a defendant who

commits a crime at the age of 21 is undeveloped and may be more reflective of immaturity than

hardened criminality.

The Supreme Court has repeatedly recognized that "because juveniles have lessened culpability

they are less deserving of the most severe punishments." *Graham v. Florida*, 560 U.S. 48, 68 (2010).

It has abolished the death penalty and life without parole sentences for all juveniles. *See Roper v.*

*Simmons*, 543 U.S. 551 (2005); *Miller v. Alabama*, 567 U.S. 460 (2012).  The Supreme Court

reasoned that because "juveniles have a 'lack of maturity and an underdeveloped sense of

responsibility'; they 'are more vulnerable or susceptible to negative influences and outside pressures,

including peer pressure'; and their characters are 'not as well formed.'" *Graham*, 560 U.S. at 68

(quoting *Roper*, 543 U.S. at 569-70).  While a "juvenile is not absolved of responsibility for his

actions…his transgression 'is not as morally reprehensible as that of an adult.'" *Graham*, 560 U.S. at

68 (quoting *Thompson v. Oklahoma*, 487 U.S. 815, 835 (1988)).  Because of these salient factors, "it

is difficult even for expert psychologists to differentiate between the juvenile offender whose crime

reflects . . . transient immaturity, and the rare juvenile offender whose crime reflects irreparable

corruption." *Id*.

Here it is clear that Mr. Farca's offense of making a false statement to a government agency

reflected his "transient immaturity" rather than any "irreparable corruption." Mr. Farca was a 21-

year-old young man who wanted to join the military and decided to provide false information

regarding his mental health history in hopes that he could join. The result of this rash decision is that

Mr. Farca now has a felony conviction which will remain with him for the rest of his life. He also

spent more than 6 months in custody. Mr. Farca is still not yet 25 years old, but he is far more mature

than he was at the time that he committed the offense. Mr. Farca's youth at the time of the offense is

a mitigating factor which weighs in favor of a "time served" sentence.

---

[5] *See* United States Sentencing Commission, "Youthful Offenders in the Federal System," p. 6, 7
available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-
publications/2017/20170525_youthful-offenders.pdf.

1

**B.    The Nature and Circumstances of the Offense**

2    The nature and circumstances of the offense also support imposition of a "time served"

3    sentence. As described in the PSR at ¶¶ 5-15, Mr. Farca's offense involved his making a false

4    statement in his application to the United States Army. *Id*. Mr. Farca was asked whether he had

5    "consulted with a health care professional regarding an emotional or mental health condition" in the

6    past seven years and he falsely checked "no" on the form. *Id*. In fact, Mr. Farca had seen a mental

7    health professional for his mental health disabilities and, according to the government, had even

8    sought a waiver from his doctor in order to join the military. *Id*. at ¶¶ 14, 15. After not obtaining the

9    necessary waiver, Mr. Farca applied nonetheless, and made the false representation in his application

10   as described above.

11   The offense in this case is not a crime of violence. Mr. Farca accepts full responsibility for this

12   offense stating that "[i] n the future, I will be sure to be truthful in every government form I fill out. I

13   am remorseful. I should have been honest." *Id*. at ¶ 19. As a result of his false statement in his Army

14   application, Mr. Farca has now spent over six months in prison. He is also a convicted felon, and will

15   suffer all of the collateral consequences that flow from that felony conviction.

16   The "time served" sentence requested by Mr. Farca represents an upward variance from the

17   guideline range calculated by undersigned counsel. In cases such as these, an upward variance is

18   virtually unheard of in this district, and there is nothing about the facts of this federal case which

19   would warrant it. Even using the PSR's guideline range, the requested "time served" sentence is

20   within the range. The PSR's recommendation of "time served" recognizes that Mr. Farca should not

21   spend any additional time in custody. The nature and circumstances of the offense support a "time

22   served" sentence.

23   **C.    Mr. Farca's History and Characteristics**

24   Under 18 U.S.C. § 3553(a), Mr. Farca's history and characteristics should also be considered.

25   "Evidence about the defendant's background and character is relevant because of the belief, long held

26   by this society, that defendants who commit criminal acts that are attributable to a disadvantaged

27   background, or to emotional and mental problems, may be less culpable than defendants who have no

28   such excuse." *California v. Brown*, 479 U.S. 538, 545 (1987)(O'Connor, concurring).

1    In this case, Mr. Farca's mental disabilities have always made it difficult for him to connect

2    with his peers, starting from when he was a young child. Exhibit A at p.1-2. Mr. Farca is very bright

3    and has demonstrated insight into the ways in which both his autism, as well as his OCD, have

4    affected his ability to lead a productive life. Mr. Farca discussed with the probation officer how his

5    OCD compulsions have had a tremendous impact on his life, PSR ¶ 51, with his main compulsion of

6    having to repeat everything that is told to him before he can form a response and then obsessing

7    about what he says after the fact complicating his ability to carry a conversation. *Id*. He discussed

8    how disabling it is to have visceral reactions to every day sounds like dripping water, *id*. at ¶ 50, and

9    how especially hard it has been in custody because he is less able to control his environment and

10   exposure to those sounds. *Id*. Mr. Farca discussed how his autism and compulsions have made it

11   difficult for him to interact with inmates while in custody, which has resulted in altercations. *Id*. ¶ 20.

12    Mr. Farca recognizes the seriousness of the charges he faces in Contra Costa County. In many

13   ways, that case has dominated the proceedings in this federal case. For example, it is the allegations

14   regarding Mr. Farca's conduct in the Contra Costa case which have kept him in custody in this case

15   for more than six months. The government attempted to provide victim impact statements to this

16   Court from individuals whom may be potential victims in his Contra Costa case, but are not victims

17   in his federal case. And the government will undoubtedly argue that Mr. Farca should remain in

18   custody, not because of his conduct for which this Court will sentence him, but rather because of the

19   conduct alleged in the pending Contra Costa County case. The probation officer also lists Mr. Farca's

20   pending 2019 case as an aggravating factor.

21    While Mr. Farca acknowledges the legitimate concerns of the government and probation officer

22   in referencing the Contra Costa case, that conduct is the subject of a separate, ongoing case, Mr.

23   Farca has not pled guilty to the offenses charged in that case and he has a presumption of innocence.

24   Should he ultimately be found guilty, he will be subjected to additional punishment by the court in

25   Contra Costa county presiding over that case. That punishment should be distinct from the sentence

26   he receives in this case based upon his false statement to the Army. Therefore, while Mr. Farca

27   agrees that the Court may consider the accusations and other information connected to Mr. Farca's

28   2019 case in considering all of the 3553 factors, Mr. Farca asks the Court to focus on the offense to

which he has pled guilty, and not let conduct, which has not yet been fully litigated and which is the subject of an ongoing and open case, eclipse the offense conduct here.

Mr. Farca is still young. He is an intelligent individual who has learned a painful lesson. He now has a felony conviction. His status as a felon will remain with him for the rest of his life and he will continue to suffer the collateral consequences of his felony conviction long after this case is concluded. Based upon Mr. Farca's history and characteristics a "time served" sentence is warranted.

**D.   Mr. Farca's Health Vulnerability In Light of the COVID-19 Pandemic is Another Reason to Impose A Sentence of Time Served**

This Court is well versed on the danger posed by COVID-19. As of May 25, 2020, the new strain of coronavirus which causes COVID-19, has infected over 5.4 million people, leading to 345,833 deaths worldwide.[6] As of May 25, 2020, there are a total of 95,280 positive cases and 3,796 deaths in California. *Id*. And in California, the curve still has not flattened. *Id*.

For those in prison, the conditions of pretrial confinement create the ideal environment for the transmission of contagious disease.[7] *See, e.g. Our Courts and Jails Are Putting Lives at Risk*, Emily Bazelon, New York Times, March 13, 2020, available at

https://www.nytimes.com/2020/03/13/opinion/coronavirus-courts-jails.html?searchResultPosition=1.
Inmates cycle in and out of detention facilities, incarcerated people generally have poorer health than the general population, and even at the best of times, medical care in custody is (at best) limited.[8] According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[9]

Because of this ongoing crisis, there is a recognition among the courts that release from custody

---

[6] *Coronavirus Map: Tracking the Spread of the Outbreak*, at https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?referringSource=articleShare (updated regularly).
[7] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910.
[8] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, *at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf
[9] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.

1  may be appropriate in these truly "extraordinary times." *See In the Matter of the Extradition of*

2  *Manrique*, 2020 WL 1307109 (N.D. Cal. 2020), As District Judge Chhabria recently stated, "We

3  should not be adding to the prison population during the COVID-19 pandemic if it can be avoided.

4  Several recent court rulings have explained the health risks—to inmates, guards, and the community

5  at large—created by large prison populations." *United States v. Garlock*, No. 18-CR-00418-VC-1,

6  2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (citing *United States v. Stephens*, No. 15-cr-95-

7  AJN, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020); *United States v. Barkman*, No. 3:19-cr-

8  0052-RCJ-WGC, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020); *In the Matter of*

9  *Extradition of Toledo Manrique*, No. 3:19-mj-71055-MAG-1 (TSH), 2020 WL 1307109 (N.D. Cal.

10  Mar. 19, 2020)).

11         Mr. Farca is among those who are vulnerable in the prison population because his OCD and

12  Misophonia make his ability to follow the guidelines set by the CDC regarding handwashing and

13  hygiene untenable. In addition, his autism and inability to relate to other inmates puts him at risk as

14  well. The "underlying purposes of sentencing include not only punishment and deterrence, but also

15  the provision of treatment to a defendant in need of it." *United States v. Bad Marriage*, 392 F.3d

16  1103, 1114 (9th Cir. 2004) (citing 18 U.S.C. § 3553(a)(2)(D)). In this case, Mr. Farca needs ongoing

17  treatment which the jail cannot adequately provide. He will receive treatment in the most effective

18  manner only out of custody. For this reason as well, a "time served" sentence is appropriate.

19  **III.**    **The Court cannot impose restitution as indicated by the PSR**

20         **A.**    **Requiring restitution would violate Mr. Farca's Sixth Amendment rights**

21         The Ninth Circuit has held that the requirement of *Apprendi v. New Jersey*, 530 U.S. 466

22  (2000), that any fact increasing a criminal penalty beyond the statutory maximum must be found by a

23  jury beyond a reasonable doubt, does not apply to restitution. *United States v. Green*, 722 F.3d 1146,

24  1149 (9th Cir. 2013). However, it noted that a subsequent Supreme Court decision "provides reason

25  to believe *Apprendi* might apply to restitution." *Id*. at 1149-51 (discussing *Southern Union Co. v.*

26  *United States*, 567 U.S. 343 (2012)).  In this case, there was no jury finding of any loss amount, nor

27  did Mr. Farca admit or agree to any loss amount. To preserve the argument, Mr. Farca objects to the

28  imposition of any restitution based on *Apprendi*.

### B.     The MVRA does not apply to Mr. Farca's offense

The PSR says that restitution should be ordered to the Army, under 18 U.S.C. § 3663A, the Mandatory Victim Restitution Act ["MVRA"], in an amount to be determined.  PSR ¶¶ 73.  The PSR's legal basis for restitution is incorrect.

"The power to order restitution is not inherent in the federal courts; it is conferred only by statute."  *United States v. Batson*, 608 F.3d 630, 633 (9th Cir. 2010).  The MVRA requires courts to order restitution "when sentencing a defendant convicted of an offense described in subsection (c)."  18 U.S.C. § 3663A(a)(1).  That section makes the MVRA apply when, as relevant here, the defendant has been convicted of "any offense . . . that is . . . an *offense against property* under [Title 18] . . . including any offense committed by fraud or deceit."  18 U.S.C. § 3663A(c)(1)(A)(ii) (emphasis added); *see also* 18 U.S.C. § 3663A(b)(1) (explaining restitution owed for "offense resulting in damage to or loss or destruction of property of a victim of the offense.").

The statute does not define "offense against property," but the Ninth Circuit has "held that 'against property' means infringing on a victim's property interest."[10]   *United States v. Luis*, 765 F.3d 1061, 1065 (9th Cir. 2014).  For example, "[t]he right to receive child support payments is a property right," and "the MVRA includes within its scope failure to make such payments."  *United States v. Stephens*, 374 F.3d 867, 871 (9th Cir. 2004).  Although the Ninth Circuit has applied the *Taylor* categorical approach to decide whether an offense was a "crime of violence" as defined in 18 U.S.C. § 16 for purposes of the MVRA,[11]  it apparently has not yet considered whether it applies to whether a defendant's conviction constitutes an "offense against property."  *Cf. United States v. Ritchie*, 858 F.3d 201, 209-11 (4th Cir. 2017) (applying fact-based, not categorical, analysis).

Analyzed categorically or factually, Mr. Farca's conviction offense, 18 U.S.C. § 1001(a)(2), making a false statement to the Army to be admitted to the Army, did not "infringe[] on [the Army's] property interest.[12]  The elements of a § 1001 offense do not require any connection to "property,"

---

[10] The Supreme Court also has not defined "offense against property," and decision from lower courts "reflect a broad spectrum of opinion."  *United States v. Collins*, 854 F.3d 1324, 1330 (11th Cir. 2017) (discussing cases).  Circuits that have not required physical damage to property have at least "involved the intentional deprivation, or attempted deprivation, of another's property."  *Id.*

[11] *United States v. De La Fuente*, 353 F.3d 766, 769-70 (9th Cir. 2003).

[12] Although the Ninth Circuit has rejected challenges to the *calculation* of restitution under the

only to the government agency's "activities or decisions."  9th Cir. Crim. Jury Instr. 8.73.  Nor did

Mr. Farca's false statement implicate the Army's "property right."  Accordingly, the MVRA does not

apply to require mandatory restitution for Mr. Farca's conviction offense.  *See United States v.*

*Dorcely*, 454 F.3d 366, 370, 376-77 (D.C. Cir. 2006) (holding that defendant convicted of lying to the

FBI in violation of § 1001 was not subject to MVRA); *cf. United States v. Miell*, 744 F. Supp. 2d 961,

965 (N.D. Iowa 2010) (holding that defendant convicted of perjury under 18 U.S.C. §§ 1621 and

1623 was not subject to MVRA).

### C.      Any restitution the Court orders must be limited to losses caused by Mr. Farca's conviction conduct

The district court has discretion to order restitution for Mr. Farca's offense, but in deciding

whether to do so it must consider Mr. Farca's financial resources, needs and earning ability.  18

U.S.C. § 3663(a)(1)(A), (B).  If "the complication and prolongation of the sentencing process

resulting from the fashioning of an order of restitution under this section outweighs the need to

provide restitution to any victims, the court may decline to make such an order."  18 U.S.C. §

3663(a)(1)(B)(ii). The Court should exercise its discretion to decline to impose restitution.

Restitution under either the MVRA or § 3663 "may be awarded only for losses for which the

defendant's conduct was an actual and proximate cause." *United States v. Kennedy*, 643 F.3d 1251,

1261 (9th Cir. 2011). Moreover, if the Court decides to order restitution under § 3663, it may do so

only for "the victim's *actual losses*," which are "determined by comparing what actually happened

with what would have happened if the defendant had acted lawfully."  *United States v. Kuo*, 620 F.3d

1158, 1164 (9th Cir. 2010) (emphasis in original; internal quotation marks omitted). Mr. Farca's false

statement at most caused the Army to have spent an unspecified sum of money -- less than the

$17,832 it claimed, VIS -- for the 36 days he spent in the Army.  As discussed above, the government

cannot establish that the Army suffered any other actual loss. Given Mr. Farca's age, mental-health

---

MVRA by defendants convicted of § 1001 along with other offenses, the false statements in those
cases involved money, and there is no indication that the defendants challenged the *application* of the
MVRA.  *See United States v. Peterson*, 538 F.3d 1064, 1067, 1074 (9th Cir. 2008) (rejecting
challenge to calculation of restitution under MVRA for defendants convicted of, *i.a.*, § 1001 for false
statements to HUD to obtain loans); *United States v. Pirtle*, 158 Fed. Appx. 878, 880 (9th Cir. 2005)
(unpublished) (rejecting challenge to calculation of restitution under MVRA for defendant convicted
of, *i.a.*, false statements in connection with theft of post office funds).

1    condition and financial circumstances and earning ability -- especially given the pandemic -- the

2    Court should decline to impose restitution.

3    **IV.    The government cannot carry its burden of establishing that the computer/Internet special conditions are legal or necessary**

4

5        The PSR recommends six separate computer-related special conditions of supervision, even

6    though, as the PSR acknowledges, Mr. Farca's conviction offense had nothing to do with the use of a

7    computer or the Internet. PSR Conditions 1, 5-7. The PSR offers the same justification for five of

8    these special conditions: They are based on the conduct underlying the pending state charges that

9    "involve the alleged use of a computer and making threats in an online forum."[13] Conditions 6-10.

10   The PSR notes that Mr. Farca admitted to spending a lot of time on the computer and the Internet,

11   that "'trolling' . . . got him into trouble and he often got carried away and rarely thought about what

12   he was saying." *Id*. The PSR also noted that Mr. Farca "played a lot of video games to escape his

13   obsessive thoughts." *Id*. The PSR noted that each of the conditions is "necessary" for community

14   protection and rehabilitation. *Id*.

15           **A.    Legal Background**

16       A court may order a special condition of supervised release "to the extent that such condition --

17   (1) is reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and

18   (a)(2)(D); (2) involves no greater deprivation of liberty than is reasonably necessary for the purposes

19   set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D); and (3) is consistent with any pertinent"

20   Sentencing Commission policy statements.  18 U.S.C. § 3583(d).  The statutory factors include those

21   the PSR here relies on: "the nature and circumstances of the offense and the history and

22   characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the need "to protect the public from further

23   crimes of the defendant" 18 U.S.C. § 3553(a)(2)(C); and the need "to provide the defendant with

24   needed educational or vocational training, medical care, or other correctional treatment in the most

25   effective manner."  18 U.S.C. § 3553(a)(2)(D).

26       Any special condition of supervision "may involve 'no greater deprivation of liberty than is

27

28   ───────────────────────

[13] The PSR's justification for the special search condition claims to be based on Mr. Farca's offense conduct and necessary for deterrence and community safety. ¶ 5.

DEFENDANT'S SENTENCNG MEMORANDUM
*FARCA*, CR 19–00643 JST

reasonably necessary' to serve" these goals.  *United States v. Lacoste*, 821 F.3d 1187, 1191 (9th Cir. 2016). The government bears the burden of establishing that a special condition of supervision is appropriate.  *United States v. Sales*, 476 F.3d 732, 735 (9th Cir. 2007).  Under these standards, the Court may not impose all the PSR's requested computer-related special conditions.

> **B.     The Court should not impose the requested complete ban on Internet access (Condition 8)**

The "vast democratic forums on the Internet" are "the most important places . . . for the exchange of views."  *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) (internal quotation marks omitted).  The Internet in general, and social media in particular, allows users "to engage in a wide array of protected First Amendment activity on topics as diverse as human thought."  *Id*. at 1735-36 (internal quotation marks omitted).  "[T]o foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights."  *Id*. at 1737.  "Even convicted criminals -- an in some instances especially convicted criminals -- might receive legitimate benefits from these means for access to the world of ideas, in particular if they seek to reform and to pursue lawful and rewarding lives."  *Id*. at 1737.  The Supreme Court in *Packingham* thus held unconstitutional, under the First Amendment, a law prohibiting registered sex offenders from accessing selected websites, including some "commonplace social media websites."  *Id*. at 1733.

Applying similar reasoning to review of special conditions of supervised release, the Ninth Circuit noted, "because access to the Internet has become so vital, courts have upheld conditions prohibiting all use of the Internet only in limited circumstances."  *Lacoste*, 821 F.3d at 1191.  The first -- that the defendant's use of the Internet was a necessary part of the conviction offense -- obviously does not apply here.  *Id*.  The second condition is that "the defendant had a history of using the Internet to commit other offenses."  *Id*.  Although the PSR seeks to justify these conditions based on allegations that Mr. Farca made threatening statements in the chat room of an online video-game website, PSR ¶ 36, these allegations are both unproved and -- however vile -- not clearly or completely unprotected by the First Amendment.  The Ninth Circuit also noted that its published decisions upholding conditions that "bar[] all Internet use only when the offenses at issue involved

1   child pornography or sexual abuse of minors." *Lacoste*, 821 F.3d at 1191 (noting also that other

2   circuits have rejected such bans even for these offenses).  Again, this condition does not apply in this

3   case.

4          In *Lacoste*, the Ninth Circuit held that a supervised-release special condition that prohibited the

5   defendant "from making *any* use of the Internet without getting his probation officer's approval . . .

6   involves a greater deprivation of liberty than is reasonably necessary to address the district court's

7   concerns" about the defendant publicly disparaging his fraud victims.  *Id.* (emphasis in original).

8                  Use of the Internet is vital for a wide range of routine activities in today's
                world—finding and applying for work, obtaining government services,
9              engaging in commerce, communicating with friends and family, and
                gathering information on just about anything, to take but a few examples.
10            Cutting off all access to the Internet constrains a defendant's freedom in
                ways that make it difficult to participate fully in society and the economy.

11   *Id.*

12         The Ninth Circuit rejected the government's argument that the ban at issue was "not really a

13   total ban," since -- as here -- it allowed Internet use with the probation officer's prior approval.  *Id.* at

14   1192.  "When a total ban on Internet access cannot be justified, . . . we have held that a proviso for

15   probation-officer approval does not clear the problem."  *Id.*  "We review the language of the

16   condition as it is written and cannot assume . . . that approval will be granted" for any otherwise-

17   banned activity."  *Sales*, 476 F.3d at 737.

18         The PSR's proposed special condition that would bar Mr. Farca from "access[ing] the Internet

19   or any 'on-line computer service,'" Condition 8, impermissibly infringes on his First Amendment

20   rights and is overbroad for the purpose of serving the statutory goals.

21         **C.     The Court should not impose the requested ban on possessing or using any
                device capable of accessing the Internet or storing data (Condition 6)**
22

23         The ban on possessing or using devices capable of accessing the Internet is overbroad and

24   vague.  The Ninth Circuit rejected a similar special condition as being plainly erroneous.  *United*

25   *States v. Barsumyan*, 517 F.3d 1154, 1160-61 (9th Cir. 2008).  As the Ninth Circuit wondered, does

26   this include "cellular phones? ATMs? Driving a modern car? Checking out groceries using a bar code

27   scanner?"  *Id.* at 1160.  In the 12 years since *Barsumyan* was decided, the list of devices "capable of

28   accessing the internet or processing or storing data" has only grown, as have the legitimate uses for

1   such devices, particularly during the current global-pandemic-induced shelter-in-place.  The proposed

2   special condition that would bar Mr. Farca even from accessing a device capable of storing data does

3   not clearly identify the devices to which it applies and is broader than necessary to serve the statutory

4   purposes.

**D.      The Court should not impose the requested ban on possession or use of "any data encryption technique or program." (Condition 10)**

7   First, there is no indication that the conduct the PSR cites to justify this proposed special

8   condition involved "any data encryption technique or program." PSR ¶ 36. Second, this proposed

9   special condition is vague and overbroad. Would it preclude Mr. Farca from, for example, using two-

10  factor authentication to protect on-line bank transactions? Installing antivirus software on a personal

11  computer? The proposed special condition is not related to the statutory factors or sufficiently clear or

12  narrowly tailored.

**E.      Mr. Farca does not object to a properly tailored and specific search condition, but the Court should not imposed the requested multiple overlapping search and monitoring special conditions (Conditions 5, 7, 9)**

15  Electronic-device search conditions "must be narrowly tailored -- producing no greater

16  deprivation of liberty than is reasonably necessary."  *Sales*, 476 F.3d at 737.  "The standard for

17  imposing the computer search condition is clear:  the condition must be 'reasonably related' to

18  preventing and deterring further criminal conduct."  *United States v. Bare*, 806 F.3d 1011, 1019 n.6

19  (9th Cir. 2015) (citing 18 U.S.C. § 3583(d)(1)).  Imposing special conditions allowing probation to

20  search electronic devices, even with reasonable-suspicion requirements, are invalid absent a showing

21  that they are necessary to serve the statutory goals of supervised release.  *See United States v.*

22  *Kitchen*, 786 Fed. Appx. 78, 79 (9th Cir. 2019) (unpublished) (vacating special condition allowing

23  searches of electronic devices with reasonable suspicion); *United States v. Forrest*, 764 Fed. Appx.

24  601 (9th Cir. 2019) (unpublished) (holding district court plainly erred in imposing reasonable-

25  suspicion special computer-search condition).

26  The PSR here cites only a generic justification for the general special search condition that

27  specifically includes electronic devices, Condition 5, and the same case-specific justification for the

28  two other computer search-and-monitoring conditions.  It does not, however, explain why all *three*

special conditions are necessary, especially given the other proposed special conditions. *Cf., e.g.*, *United States v. Savastio*, 777 Fed. Appx. 4, 6-7 (2d Cir. 2019) (approving special condition, for defendant with "history of accessing child pornography over the Internet and . . . prior violations of supervised release," that required either participation in CIMP or probation's authorization to access Internet); *United States v. Ullmann*, 788 F.3d 1260, 1261-62 (10th Cir. 2015) (noting that probation replaced "twelve conditions restricting Internet use with a single condition" requiring participation in CIMP).

Mr. Farca does not object to the proposed special search condition that would allow probation to search "any computers, cell phones, and other electronic devices" under his control based on "reasonable suspicion of contraband or evidence of a violation of a condition of release." Condition 5. This special condition appropriately balances any need for deterrence and protection with the facts that he did not use a computer in connection with the conviction conduct, he has not been convicted of any computer-related conduct, he retains his First Amendment rights of free speech and association and he (like the rest of us) needs electronic devices and access to the Internet to carry out nearly every activity in contemporary life. The government cannot carry its burden of establishing that any computer search or monitoring condition beyond that is consistent with his constitutional rights and the statutory limitations on special conditions of supervised release.

**F.    Imposition of the most-restrictive Internet and computer special conditions would violate constitutional principles of anti-delegation**

Several of the PSR's proposed special conditions also are improper because they impermissibly delegate too much authority to the probation office. "[A] probation officer may not decide the nature or extent of the punishment imposed upon a probationer." *United States v. Stephens*, 424 F.3d 876, 881 (9th Cir. 2005). "Under our constitutional system the right . . . to impose the punishment provided by law is judicial." *Ex parte United States*, 242 U.S. 27, 41-42 (1916). Accordingly, the limitation on the probation officer's authority is "of constitutional dimension." *Stephens*, 424 F.3d at 881.

As a result, "[t]he law has, by and large, developed along the principle that, where the court makes the determination of whether a defendant must abide by a condition, and how," the court may

1    "delegate to the probation officer the details of where and when the condition will be satisfied." *Id.*

2    at 880 (footnote omitted; emphasis in original).  In *Stephens*, for example, the Ninth Circuit upheld a

3    condition of supervised release requiring the defendant to participate in a drug treatment program,

4    with the particular program to be selected by the probation officer.  *Id.*  By contrast, in *United States*

5    *v. Esparza*, the Ninth Circuit concluded that the district court improperly delegated its authority to the

6    probation officer when it ordered the defendant "to participate in a counseling or sex offender

7    treatment program, 'which may include inpatient treatment, as approved and directed by the

8    Probation Officer.'"  552 F.3d 1088, 1091 (9th Cir. 2009)).  Noting that "[i]n terms of the liberty

9    interest at stake, confinement to a mental health facility is far more restrictive than having to attend

10   therapy sessions, even daily," the Court held that it was impermissible to leave this decision to the

11   discretion of the probation officer.  *Id.*; *see also United States v. Wolf Child*, 699 F.3d 1082, 1096 n.4

12   (9th Cir. 2012) (noting that condition prohibiting defendant from seeing his daughters without

13   permission from probation officer might be unconstitutional delegation of authority, but not reaching

14   issue in light of holding that condition unduly infringed on defendant's liberty interests).  Courts have

15   likewise invalidated conditions that delegate to a probation officer the authority to decide whether,

16   and under what circumstances, a defendant can use the Internet.  *See, e.g., United States v. Blair*, 933

17   F.3d 1271, 1275-76 (10th Cir. 2019) (holding that "a special condition of release that gives the

18   probation office discretion to ban completely a defendant's use of the Internet" violates §

19   3583(d)(2)); *United States v. Scott*, 316 F.3d 733, 736 (7th Cir. 2003) (holding that condition

20   prohibiting "access to any Internet Services without prior approval of the probation officer" was an

21   impermissibly "open-ended delegation" of "standardless power").

22        The special conditions proposed in this case include and go beyond allowing the probation

23   officer to decide whether the defendant can use the Internet.  Condition 8.  They also delegate to the

24   probation officer the decision whether or not Mr. Farca can "possess or use . . . any electronic device

25   capable of accessing the internet or processing or storing data."  Condition 6.  The discretion these

26   special conditions would grant to the probation officer in Mr. Farca's case extends far beyond the

27   "ministerial tasks" deemed acceptable in *Stephens*.  It would be an unconstitutional for the Court to

28   delegate to probation its authority to decide the "nature and extent" of the restrictions on Mr. Farca's

ability to possess and use computers and access the Internet.

## CONCLUSION

Mr. Farca respectfully asks the Court to correctly calculate the advisory guideline range using a loss amount of less than $40,000 for the reasons described above. Irrespective of which loss amount the Court uses, Mr. Farca asks the Court to sentence him, consistent with the recommendation of the probation officer, to a sentence of "time served" followed by three years of supervised release and a $100 special assessment. Finally, Mr. Farca asks the Court to impose more narrowly tailored conditions of release related to his use of a computer as described above because the multiple overlapping conditions recommended by the probation officer are overbroad bordering on unconstitutional.


Dated:      May 26, 2020                            Respectfully submitted,

                                                    STEVEN G. KALAR
                                                    Federal Public Defender
                                                    Northern District of California

                                                             /S
                                                    JOYCE LEAVITT
                                                    Assistant Federal Public Defender